UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMUEL SHIPLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00766-RLY-MJD |
| | ) | |
| JONI WILLIAMS, in her individual and official capacities as Executive Director of Henry County Community Corrections, | ) ) ) | |
| | ) | |
| HENRY COUNTY COMMISSIONERS, | ) | |
| | ) | |
| HENRY COUNTY COMMUNITY CORRECTIONS, | ) ) | |
| | ) | |
| HENRY COUNTY SHERIFF'S DEPARTMENT, | ) ) | |
| | ) | |
| RIC MCCORKLE, and | ) | |
| | ) | |
| UNKNOWN HENRY COUNTY OFFICIALS 1-50, in their individual and official capacities, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Samuel Shipley alleges that while on house arrest under the supervision of Henry County Community Corrections (or "HCCC"), Jason Bertram, then-Deputy Director of HCCC, abused his position of power over Plaintiff to sexually gratify himself. In his Amended Complaint, Plaintiff sues Defendants HCCC; Joni Williams, in her individual and official capacities as Executive Director of HCCC; Henry County

Commissioners; Henry County Sheriff's Department; former Henry County Sheriff Ric McCorkle; and various "unknown" Henry County Officials, in their individual and official capacities, alleging that they violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581–97. That statute creates a civil remedy against a person who knowingly benefits from participation in a venture that the person knew or should have known engaged in an act in violation of federal forced labor and trafficking laws. 18 U.S.C. § 1595(a). Thus, Plaintiff seeks to hold Defendants civilly liable under a theory of participant liability.

There are two motions for summary judgment before the court: (1) Defendants Henry County Commissioners, Henry County Sheriff's Department, and Ric McCorkle's Motion for Summary Judgment and (2) Defendants Joni Williams and Henry County Community Corrections' Motion for Summary Judgment. For the reasons set forth below, the court **GRANTS** both Motions for Summary Judgment.

## I.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact" and that the "movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). Instead, the court must construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id*. A genuine dispute as to a material fact exists

if, based on the evidence presented, "a reasonable jury could return a verdict for the non-moving party." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.    Factual Background

### A.    Henry County Community Corrections

The HCCC operates Henry County's community corrections program and provides services to individuals in lieu of incarceration, including house arrest. Ind. Code § 11-12-1-1. The HCCC is primarily funded by state grants administered by the Department of Corrections and user fees paid by HCCC program participants. *Id.* §§ 11-12-1-1, 11-12-2-12; (*see also* Filing No. 74-9, Williams Dep. at 180, 182). User fees collected from community corrections program participants are deposited into the county's user fee fund, which is administered by the HCCC Advisory Board. Ind. Code § 11-12-2-12(a).

HCCC Advisory Board members are determined by statute and include 24 members, including, but not limited to, the county sheriff, the prosecuting attorney, and two judges. *Id.* § 11-12-2-2(b). Thus, by virtue of his position as Sheriff of Henry County, Ric McCorkle served on the HCCC Advisory Board. (Filing No. 74-7, McCorkle Dep. at 16).

The HCCC Advisory Board appointed Joni Williams as Executive Director of HCCC in 2014. (Williams Dep. at 12); *see also* Ind. Code § 11-12-2-3.5(a) (stating the community corrections advisory board is responsible for the appointment of a director, subject to the approval of the county executive). When Williams was appointed Executive Director, Jason Bertram was HCCC's Deputy Director. (Williams Dep. at 23).

3

As employees of the HCCC, Williams and Bertram were employees of Henry County. Ind. Code § 11-12-2-3.5(b).

### B.    Plaintiff's Allegations Against Bertram

In April 2017, Plaintiff was convicted of possession of marijuana in Hancock County, Indiana, and was sentenced to one year of probation. (Filing No. 74, Pl.'s Interrog. Answers, No. 1; Filing No. 74-2, Sentencing Order). Later that year, Plaintiff was found guilty of violating the terms of his probation and was sentenced to a term of 180 days on house arrest with an electronic monitoring ankle bracelet and regular drug testing. (Filing No. 47, Am. Compl. ¶ 27). Because Plaintiff was living in Henry County, he requested that his supervision from Hancock Community Corrections be transferred to HCCC. (Filing No. 74-4, Pl. Dep. at 36).

On January 10, 2018, after the transfer was approved, Plaintiff reported to HCCC where he met with HCCC Deputy Director Jason Bertram. (*Id*. at 46). Plaintiff gave Bertram $350 cash for the electronic monitoring equipment. (*Id.* at 55–56, 62). Although Plaintiff knew he was going to be drug tested, he used cocaine just an hour or two before his arrival. (*Id.* at 48–49, 58–59). He also had a small bag of cocaine in his pocket. (*Id.* at 50).

When the time came for Plaintiff to give his urine test, Bertram escorted him to the bathroom where he observed Plaintiff provide a urine sample. (Am. Compl. ¶¶ 29–30). After Plaintiff provided his sample, he and Bertram went to Bertram's office, and Bertram placed the urine test on his desk. (Pl. Dep. at 60–61). Plaintiff testified he was "[v]ery scared" because he knew he failed the test. (*Id*. at 59).

4

Plaintiff was sitting in Bertram's office when Bertram told Plaintiff he should be in porn. (*Id.* at 61). Bertram shut the door to his office, but Plaintiff did not know if the door was locked or if the door even had a lock on it. (*Id.* at 68, 73, 198). Bertram then asked Plaintiff if he could see his penis. (*Id.* at 61). Plaintiff was "flabbergasted and shocked." (*Id.* at 62). Bertram asked Plaintiff if he wanted some of his money back. (*Id.* at 62). Plaintiff laughed and said he wanted all his money back. (*Id.*). Plaintiff told Bertram he did not "want to go to jail" and that his urine was "dirty." (*Id.* at 63). He also handed him the small bag of cocaine that was in his pocket. (*Id.* at 51). Bertram threw his urine test in the trash and placed the bag of cocaine in his desk drawer. (*Id.* at 55, 63). Bertram told Plaintiff that he "run[s] this place, [and] you don't have to worry about any of that." (*Id.* at 64). Bertram assured Plaintiff that if he "need[ed] to do something, [he should] just call [him] and let [him] know." (*Id.* at 65).

Plaintiff put two and two together, and realized Bertram was making him an offer. (*Id.* at 64). As Plaintiff understood it, the offer was that if he showed Bertram his penis, Bertram would not require him to comply with the formalities of house arrest. (*Id.* at 66 ("Q: So was it your understanding at that point that if you showed Bertram your penis, he was not going to require you to comply with the formalities of the program, he was just going to let you go about business as usual, essentially? A: Yeah, yes, that's exactly what it meant.")).

Plaintiff then told Bertram he wanted to go to Indianapolis and buy cocaine. (*Id.* at 65). Bertram warned him to "be careful" and gave him his money back. (*Id.* at 65–66). Plaintiff felt "stuck between freedom [and doing] what [he thought was] right or

5

wrong at that point . . . [and] freedom won." (*Id.* at 66). Without going into specific details, Bertram asked for more, and a sexual encounter occurred. (66–67, 84). Bertram took a picture of Plaintiff's penis in his mouth. (*Id.* at 84).

Plaintiff left Bertram's office with an ankle monitor, but the monitor was never activated, and Plaintiff was able to travel without limitations. (*Id.* at 69–70, 72). Plaintiff went to Chicago for a concert, to northern Indiana to see his dad, and traveled to Indianapolis multiple times to buy cocaine. (*Id.* at 72–73).

The next week, Bertram called Plaintiff multiple times to "hang out." (*Id.* at 86, 109). Plaintiff eventually agreed because Bertram told him he had "treats," which Plaintiff interpreted as drugs. (*Id.* at 86–87). Bertram picked up Plaintiff and drove him to his house. (*Id.* at 89–90). Once there, Bertram gave Plaintiff methamphetamine, and then asked to see his penis again. (*Id.* at 96). Plaintiff felt "pressure" to do so, and the two had another sexual encounter. (*Id.* at 99–100).

After their second encounter, Bertram called and asked if Plaintiff wanted to meet again and hang out because he had "some treats for [him]." (*Id.* at 108–09). Plaintiff ultimately agreed but said he was not going to stay long. (*Id.* at 109–10). Bertram picked Plaintiff up, took him to his home, and gave Plaintiff a basket full of prescription drugs that belonged to Bertram's former (now deceased) boyfriend. (*Id.* at 116–19). There was no sexual encounter. (*Id.* at 115).

In April 2018, Plaintiff met with Bertram because his time on home detention had ended. (*Id.* at 123–24). Bertram asked Plaintiff if he had money for the Community Corrections program fees. (*Id.* at 125–26). Plaintiff said he did not. (*Id.* at 126).

Bertram threw Plaintiff a pair of scissors and told him to cut off his ankle bracelet. (*Id.* at 127). Plaintiff did so and walked out of Bertram's office. (*Id.* at 127). Plaintiff never saw Bertram again. (*Id.* at 204).

### C.    Plaintiff Informs Others About Bertram

More than a year later, in 2019, Plaintiff was "struggling with some depression," and his girlfriend, Sara Young, asked him what was troubling him. (Filing No. 74-5, Young Dep. at 14). Plaintiff told her what had occurred between him and Bertram. (*Id.*).

In February 2020, Plaintiff, who was in jail awaiting trial on new charges for possession of methamphetamine, asked Young to contact New Castle Detective Chase Hightower. (Pl. Dep. at 133). On February 12, 2020, Plaintiff met with Detective Hightower, and Plaintiff told him the "full, complete story" regarding his experience with Bertram while under his supervision at HCCC. (*Id.* at 232; Young Dep. at 19). Detective Hightower passed along a report of his interaction with Plaintiff to Indiana State Police ("ISP") Detective Scott Jarvis. (Filing No. 74-10, Hightower Dep. at 103).

Young also called Sheriff McCorkle multiple times, and because of those calls, Chief Deputy Jay Davis spoke with Plaintiff to find out who Young was and why she was calling. (*Id.* at 226–27). Plaintiff told Deputy Davis he "need[ed] to get in touch with somebody who cares." (*Id.* at 227–28). Plaintiff did not tell Deputy Davis "the whole verbatim story," but Plaintiff did tell him that Bertram offered sexual favors in lieu of payment or in exchange for leniency or drugs. (*Id.* at 227–30); Filing No. 74-6, Davis Dep. at 32–33).

When Sheriff McCorkle learned of Plaintiff's allegations against Bertram from Deputy Davis, he directed Deputy Davis to initiate an investigation into the allegations. (McCorkle Dep. at 13–15). Deputy Davis informed Sheriff McCorkle that the Sheriff's Department's Detective Division had turned the investigation over to the ISP. (*Id.*).

Within the next two days, Plaintiff met with ISP Detective David Preston to discuss his allegations against Bertram. (Pl. Dep. at 10–11). In February 2020, Plaintiff was taken to the New Castle Police Department for a polygraph[1] conducted by the ISP. (Filing No. 77-15, Jarvis Dep. at 29; Hightower Dep. at 48; Pl. Dep. at 10–11). Plaintiff passed the polygraph test regarding his statements about having engaged in sex acts with Bertram. (*See* Jarvis Dep. at 29–30; Hightower Dep. at 48).

### D.    Prior Allegations Against Bertram

Detective Hightower testified that it was widely known in the law enforcement community that Bertram was gay. (Hightower Dep. at 100). He also testified that there were rumors in the law enforcement community about Bertram having sexual relations with persons while they were in the custody of HCCC. (*Id.* at 101). Prior to February 2020, Detective Hightower did not believe he had enough information to investigate Bertram. (*Id.* at 102). Former Henry County Sheriff Bruce Baker, whose term in office preceded Sheriff McCorkle's, also heard rumors that Bertram was having sex with people involved in the Henry County justice system. (Filing No. 78-4, Baker Dep. at 50–51).

---

[1] Defendants cite Ex. 29 from Detective Hightower's deposition, which is the February 17, 2020, polygraph. The court was unable to find that exhibit on the docket.

He did not "do anything to follow up on those rumors" because, in his opinion, they were rumors and nothing more.  (*Id.* at 54).

In 2018, Sheriff McCorkle reported to Henry County Prosecutor Joseph Bergacs that there was a PREA[2] complaint made by former HCCC client Michael Ritchie against Bertram.  (Filing No. 97-1, June 12, 2018, Email[3] from Bergcas to ISP Detective Jarvis). ISP Detective Philip Byers interviewed Ritchie and gave a report to Prosecutor Bergacs. (Filing No. 74-8, Byers Dep. at 19–21).  Prosecutor Bergacs declined to bring a criminal case against Bertram at that time because, as Detective Byers understood it, the statute of limitations on any chargeable crime had expired.  (*Id.* at 17, 22).

### E.     Chris Moore's Complaint

On September 21, 2021, Williams received a text message from part-time HCCC Field Officer Jeff Passow asking her to call him.  (Filing No. 77-1, Williams Decl. ¶¶ 3–4).  Williams returned his call the same day.  (*Id.* ¶ 5).  During the call, Passow relayed to Williams what HCCC program participant Chris Moore had reported to him.  (*Id.* ¶ 7). Specifically, Moore told Passow that when he was at the HCCC office providing a urine

---

[2] PREA stands for Prison Rape Elimination Act.

[3] This email, which was sent from Prosecutor Bergacs to ISP Detective Jarvis, is the subject of Plaintiff's Motion for Leave to File Supplemental Evidence.  In the email, Prosecutor Bergacs states in part that he "received a call from Sheriff McCorkle that there was a PREA complaint by an inmate Michael Todd Ritchie . . . against  . . . Jason Bertram.  Mr. Bertram is also a special deputy appointed by the Sheriff."  Plaintiff seeks to introduce the email to establish that Sheriff McCorkle knew information related to the 2018 Ritchie allegations and to show that Bertram was an agent of the Sheriff's Department.  Plaintiff's  motion (Filing No. 97) is **GRANTED in part** and **DENIED** in part.  The motion is **GRANTED** to the extent the email reflects that Sheriff McCorkle was aware of the PREA complaint filed by Ritchie.  The motion is **DENIED** regarding Prosecutor Bergac's statement that "Bertram is also a special deputy appointed by the Sheriff" because that statement, made by a non-party to another non-party, is inadmissible hearsay.  Fed. R. Evid. 801.

drug test, Betram had (i) twice asked to see Moore's genitalia, (ii) offered Moore $40, and (c) told Moore not to say anything about what had happened. (*Id.* ¶ 7). Passow also said that Moore had accepted the $40. (*Id.*).

### F.     Williams Contacts Prosecutor Bergacs and Judge Crane

Upon receiving that information, Williams called Prosecutor Bergacs, who was a member of the HCCC Advisory Board. (*Id.* ¶ 8). Prosecutor Bergacs stated that there had been an investigation of a similar allegation against Bertram in the past. (*Id.* ¶ 11). He said the investigation might still be open and that he would look into the matter. (*Id.*). He asked Williams not to do anything at that time. (*Id.*).

A few days later, Williams contacted Judge Kit Crane, who was also a member of the HCCC Advisory Board, for further guidance. (*Id.* ¶ 13). Judge Crane told her she should not say or do anything that might alert Bertram or anyone else of Moore's allegations because, if she did, it could interfere with a law enforcement investigation of the matter. (*Id.* ¶ 15).

### G.     Detective Preston Investigates

In early October 2021, Detective Preston informed Williams that the ISP was investigating Moore's allegations. (*Id.* ¶ 18).

A few weeks later, Detective Preston asked Williams to discreetly take some photographs of Bertram's office. (*Id*. ¶ 19; Filing No. 77-8, Preston Dep. at 36–37, 158–59). She did so and sent him the photographs. (Williams Decl. ¶ 19; Preston Dep. at 36–37).

Sometime after that, Detective Preston asked Williams to locate documents relating to Plaintiff's HCCC supervision. (Williams Decl. ¶ 20). Williams did not find any record that Plaintiff had ever been under HCCC supervision and related that information to Detective Preston. (*Id.*). She also did not find any record that Plaintiff or anyone on his behalf had ever paid the HCCC any money for Plaintiff's electronic monitoring equipment and program participation fees. (*Id.* ¶ 48; Filing No. 77-3, Report of Collections).

Detective Preston also interviewed two other HCCC program participants, Tyler Martz and Justin Robinson, who made similar allegations against Bertram. (Preston Dep. at 18, 44; *see also Martz v. Williams, et al.*, No. 1:24-cv-2001-RLY-MJD). Upon the request of Detective Preston, Williams provided him documents relating to Marz's and Robinson's HCCC supervision. (Williams Decl. ¶ 21).

On December 14, 2021, the ISP came to the HCCC office with a search warrant. (*Id.* ¶ 23). The search warrant authorized the ISP to search Bertram's office, computers, and cell phones. (*Id.*). Williams was present when the search warrant was executed. (*Id.* ¶ 24).

## H.    Bertram is Fired and Criminally Charged

Immediately after the ISP completed their search and talked to Bertram, Williams placed Bertram on administrative leave at the direction of HCCC Advisory Board President, Judge Bob Witham. (*Id.* ¶ 25). Bertram's employment with HCCC officially ended on January 7, 2022, after the HCCC Advisory Board voted to terminate his employment. (*Id.* ¶ 28).

Criminal charges were filed against Bertram on January 11, 2023. (Filing No. 47-1, Am. Information). Bertram died by suicide a week later. (Am. Compl. ¶ 105).

## III. Discussion

Plaintiff brings a claim under the TVPRA against Defendants. Section 1595 of the TVPRA provides a civil cause of action to "a victim of a violation of [the TVPRA] . . . against the perpetrator [] or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act" in violation of the TVPRA. 18 U.S.C. § 1595(a). Plaintiff's Section 1595 claim is brought under a theory of participant liability. Plaintiff alleges he was a victim under the TVPRA because Bertram held him to a condition of peonage in violation of 18 U.S.C. § 1581, subjected him to forced labor in violation of 18 U.S.C. §1589, and trafficked him in violation of 18 U.S.C. §1590 while he was under the supervision of the HCCC. He seeks to hold Defendants liable for their participation in the forced labor/trafficking venture.

To establish a claim under the TVPRA under a theory of participant liability, the plaintiff has the burden of proving that "(1) a venture has engaged in an act in violation of [the TVPRA]; (2) the defendant knew or should have known that the venture had violated [the TVPRA]; (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023). Defendants argue there is no evidence to support any of those elements. For purposes of this motion, the court assumes Plaintiff was a victim of a TVPRA violation because, even if he was, Plaintiff has not established, as a matter of

12

law, the second, third, and fourth elements of his claim for participant liability under the TVPRA.

### A.    Whether Defendants Participated in a Venture

In *G.G.*, the Seventh Circuit considered the meaning of "venture" as that word is used in Section 1595 of the TVPRA. *Id.* at 554. The plaintiff, G.G., ran away from home at age thirteen and was taken by a sex trafficker. *Id*. at 549. The trafficker used Backpage.com to "advertise" G.G. *Id*. Backpage is an online marketplace that was a "hub" for human trafficking and received most of its revenue from advertisements for sex. *Id.* at 549–50. Salesforce contracted with Backpage before and during the time when G.G. was trafficked. *Id*. at 549. G.G. and her mother filed suit against Salesforce under the participant theory of liability, and the district court ruled in favor of Salesforce. *Id.* at 550–51. G.G. appealed. *Id.* at 551.

After determining that G.G. was a "victim" under the TVPRA and that Backpage and the trafficker could be held criminally liable under the TVPRA, the Seventh Circuit considered whether G.G. adequately pleaded Salesforce was part of a "venture" with Backpage and the trafficker. *Id*. at 553–54. In construing the term "venture," the court agreed with the Eleventh Circuit that under the plain meaning of "venture," the venture need not be related to sex trafficking; rather, "the alleged venture can be a '*commercial* venture[]' like running or expanding a business." *Id.* at 554 (quoting *Doe #1 v. Red Roof Inns, Inc*., 21 F.4th 714, 727 (11th Cir. 2021) (emphasis in original); *see also Red Roof Inns*, 21 F.4th 724 ("The ordinary meaning of 'venture' is an undertaking or enterprise involving risk and potential profit.").

13

The Seventh Circuit held that G.G. sufficiently alleged the existence of a venture by characterizing Salesforce as a "partner" who helped "facilitate and support Backpage's exponential growth," where the venture at issue was the growth, expansion, and profitability of Backpage. *G.G.*, 76 F.4th at 554. The court also determined that Salesforce had "participated" in the venture. *Id*. at 558. "Participation" means "'culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success.'" *Id*. at 559 (quoting *Doe v. GTE Corp*., 347 F.3d 655, 659 (7th Cir. 2003)). According to the court, "[w]here the participant provides assistance, support, or facilitation to the trafficker through [] a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *Id*.

By contrast, in 2024, the U.S. Court of Appeals for the District of Columbia held that the plaintiffs did not sufficiently allege participation in a venture. *Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024). There, the plaintiffs were cobalt miners in the Democratic Republic of Congo who were injured in mining accidents. *Id.* at 407. The plaintiffs sued five American technology companies under the TVPRA for "forced labor" because the companies purchased cobalt through the global supply chain with the alleged knowledge that the supply chain included cobalt procured by forced labor. *Id*. at 408. The D.C. Circuit, relying on the ordinary meaning of "venture," defined it as "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." *Id.* at 415. Based on that definition, the court found that the miners had not adequately alleged the tech companies participated in a "venture" because there was

14

"no shared enterprise between the Companies and the suppliers who facilitate forced labor." *Id*. The tech companies owned no interest in their suppliers; did not share in the suppliers' profits and risks; and did not otherwise do "more than engage[] in an ordinary buyer-seller transaction." *Id*. The court contrasted these circumstances with those in *G.G. v. Salesforce*, where "the alleged 'business relationship' was more than just a purchasing agreement." *Id*. The court explained: "Salesforce provided direct support, specific business advice, and productivity enhancing software to Backpage.com, which hosted prostitution ads," thereby facilitating a business "whose business model was built upon . . . violations of [federal sex trafficking law]." *Id*. (citing *G.G.*, 76 F.4th at 560–61) (second alteration in original).

Plaintiff defines the venture as "the [HCCC] organization and program itself, through which Bertram trafficked and sexually abused many of the vulnerable men under his supervision and power, including [Plaintiff]." (Filing No. 78, Pl.'s Resp.[4] at 18; Filing No. 79, Pl.'s Resp. at 21–22). In Plaintiff's view, Defendants participated in the venture by virtue of their association with HCCC. For example, the Henry County Commissioners established the HCCC Advisory Board, Ind. Code § 11-12-2-2(a); appointed ten of its members, *id*. § 11-12-2-2(a)(12)(A)–(G); and helped ensure that HCCC was adequately funded, *id*. § 11-12-2-2(f). Sheriff McCorkle was a member of the HCCC Advisory Board. (McCorkle Dep. at 16). And Williams, as Executive

---

[4] Filing No. 78 is Plaintiff's Response to the Motion for Summary Judgment filed by the Henry County Commissioners, Henry County Sheriff's Department, and Ric McCorkle. Filing No. 79 is Plaintiff's Response to the Motion for Summary Judgment filed by Joni Williams and the Henry County Community Corrections.

Director of the HCCC, oversaw the HCCC, was responsible for its budget, grant writing and grant funding, and served as court coordinator for the Henry County Veterans Court and Drug Court. (Williams Dep. at 12).

The entire premise of Plaintiff's argument is wrong. The HCCC is not a venture. It is not a for-profit business. *G.G.*, 76 F.4th at 554. It is not "an undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 724. And it is not "an enterprise that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415. The HCCC is a governmental entity that is funded by user fees and state grants, and it provides the courts and offenders with alternatives to incarceration.

Even if the HCCC is a venture within the meaning of Section 1595, Defendants did not participate in the venture. Participation requires more than being associated with a venture. It requires a participant to assist, support, or facilitate a trafficker through a "continuous business relationship." *G.G.*, 76 F.4th at 559. There is no evidence that any of the Defendants had a "continuous *business* relationship" with Bertram, nor evidence that any of the Defendants had a tacit agreement to assist, support, or facilitate Bertram's sexual abuse of plan participants. *See Apple*, 96 F.4th at 416 (finding defendants did not participate in a venture because "[t]he purported agreement . . . was merely to buy and sell cobalt."). This is best exemplified by Sheriff McCorkle's and Williams' response to the allegations brought forth by HCCC program participants. Sheriff McCorkle's response was to contact either the prosecutor or the ISP to investigate. (McCorkle Dep. at 15, 10–21; June 12, 2018, Email from Bergcas to ISP Detective Jarvis). Williams' response was to contact Prosecutor Bergacs and Judge Crane, and later, to facilitate the

16

investigation by providing much needed information and documentation to the ISP. (Williams Decl. ¶¶ 8, 13, 18–22). Their conduct undermines any claim of participation in a venture. Therefore, the court finds, as a matter of law, that Defendants did not participate in a venture under Section 1595 of the TVPRA.

### B.    Whether Defendants Had Knowledge

Under the second element, Plaintiff must establish that Defendants "knew or should have known that *the venture* had violated [the TVPRA]." *G.G.*, 76 F.4th at 556 (emphasis added). Thus, for participant liability to attach, Defendants "must have had at least constructive knowledge that the 'venture' in question [] engaged in an act in violation of [the TVPRA]." *Id.* at 555 n.9. Constructive knowledge is "that knowledge which 'one using reasonable care or diligence should have.'" *Red Roof Inns*, 21 F.4th at 725 (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)).

Plaintiff argues Defendants knew or should have known that Bertram was using the HCCC to sexually abuse and traffic men before his January 2020 sexual abuse by Bertram. Plaintiff's evidence consists largely of Detective Hightower's testimony regarding rumors within the Henry County law enforcement community that Bertram engaged in sex acts with men under his supervision. (Hightower Dep. at 26, 100–01). But rumors of that sort in no way suggest that *Defendants* had actual or constructive knowledge of Bertram's sexual exploitation of HCCC participants. *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016) (stating "'rumors' . . . have been held not to constitute 'actual knowledge'") (quoting *Shrum ex rel. Kelly v. Klunk*, 249 F.3d 773, 780 (8th Cir. 2001)); *Blaylock v. Orange Cnty. Probation Dep't*, No. 2:23-cv-05221 MRA

17

(ADS) 2024 WL 5396266, at *9 (C.D. Cal. Dec. 12, 2024) (noting "suspicion of wrongdoing alone does not equate to constructive knowledge").  More importantly, Sheriff McCorkle testified that he was not aware of rumors about Bertram's sexual exploits with those involved with the Henry County justice system until Plaintiff made a complaint about Bertram.  (McCorkle Dep. at 13–14) (testifying he did not become aware of rumors about Bertram having sex with people involved in the Henry County justice system until Plaintiff came forward).  Williams was not aware of any rumors regarding Bertram either.  (Williams Decl. ¶ 33 (testifying that prior to September 21, 2021, she "had not heard any rumors that Jason was sexually propositioning, sexually assaulting, or raping male HCCC program participants")).

Plaintiff argues Williams had to have known about Bertram's transgressions because she was the Executive Director of the HCCC, her office was adjacent to Bertram's, and Bertram used his work phone to store images of nude men and gay pornography.  (Williams Dep. at 12, 51; Filing No. 79-4, ISP Report at ECF p. 11).  But these facts fail to raise a genuine issue of material fact for four reasons.  First, there were no reports of sexual abuse and no widely known information regarding Bertram's abuse that should have led her to have discovered it.  (Williams Decl. ¶¶ 34–35 (testifying she never suspected Betram was engaged in sex acts with HCCC program participants and had never spoken to anyone in law enforcement regarding those allegations until September 21, 2021); Hightower Dep. at 100 (testifying that it was not widely known that Bertram was propositioning men who were HCCC participants)).  Second, according to Detective Preston, Bertram hid his misconduct from Williams.  (Preston Dep. at 45–46).

Third, Williams was not informed of the law enforcement investigations of Bertram that occurred in 2018 and 2020.  (Byers Dep. at 26–27, 34–35; Jarvis Dep. at 70–72; Hightower Dep. at 118; McCorkle Dep. at 18; Davis Dep. at 77–78, 113–17).  Lastly, the images on Bertram's phone were found by the ISP during a forensic examination of Bertram's phone in 2021, *after* Plaintiff came forward.  (ISP Report at ECF p. 11).

As for HCCC itself, Plaintiff argues it should have known of Bertram's sexual transgressions because Sheriff Baker was a member of the HCCC Advisory Board during his term in office.  But Sheriff Baker testified to only hearing *rumors* of Bertram's sexual transgressions.  (Baker Dep. at 53 ("Q: Okay.  And what else did you hear about Jason Bertram?  A: Just the rumors. . . . that he . . . acted inappropriate sometimes around some of the clients.  Q: Sexually inappropriate?  A: That's how I took it.").  Sheriff Baker "didn't hear any details" and took the matter no further because they were just rumors. (*Id.* at 54).  Accordingly, the court finds, as a matter of law, that Defendants did not have actual or constructive knowledge that an alleged forced labor/trafficking venture violated the TVPRA.

### C.    Whether Defendants Knowingly Benefited from Their Participation in the Venture

The last element requires a plaintiff to establish that the defendants knowingly benefited from their participation in a venture that violates the TVPRA.  The benefit does not have to take the form of "profits," but the defendants must be aware that they are benefiting in some manner.  *G.G.*, 76 F.4th at 564.

Plaintiff asserts Defendants benefited from their participation in the alleged HCCC forced labor/trafficking venture in the following ways. Henry County benefited from state grants and user fees collected from HCCC program participants; the Sheriff's Department and Sheriff McCorkle benefited from HCCC because it provided an alternative to incarceration in an already overcrowded Henry County Jail; Bertram's work as Deputy Director of HCCC, including his day-to-day supervision in the office, benefited HCCC; and Williams' employment as Executive Director benefited HCCC. Plaintiff's assertions miss the mark. None of these asserted benefits were in any way related to the alleged forced labor/trafficking venture perpetrated by Bertram. *See, e.g.*, *Treminio v. Crowley Mar. Corp.*, 707 F. Supp. 3d 1234, 1251 (M.D. Fla. 2023) ("In addition to mens rea and commercial sex act requirements . . . , the benefit an employer receives must be related in some form to the alleged sex trafficking."). The court therefore finds, as a matter of law, that Defendants did not knowingly benefit from their participation in any alleged venture.

## IV. Conclusion

For the reasons just explained, the court **GRANTS** Defendants Henry County Commissioners, Henry County Sheriff's Department, and Ric McCorkle's Motion for Summary Judgment (Filing No. 73), and **GRANTS** Defendants Henry County Community Corrections and Joni Williams' Motion for Summary Judgment (Filing No. 75). In addition, for the reasons explained in footnote 3 of this Entry, the court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Leave to File Supplemental Evidence

(Filing No. 97).  Final judgment shall issue forthwith.

**IT IS SO ORDERED** this 30th day of September 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.